BENJAMIN BLOSSOM and CHARLES M. BLOSSOM *vs.* EDWARD
CHAMPION and ALBERT WOODHULL.

The plaintiffs contracted to sell to B. 843 barrels of spirits of turpentine, for
cash, to be paid upon delivery of the turpentine on board the ship Victoria.
Before the goods had been paid for, or delivered on board the ship, B. sold
the same to W., and the latter, after 529 barrels had been put on board, went
to the office of the agent of the ship and representing that the remainder
was alongside and would be put on board without delay, and giving the
guaranty of a third person to that effect, he procured a bill of lading for
800 barrels, which was signed by C. as master of the ship, and delivered to
W. as owner and shipper of the goods. W. indorsed the bill of lading to
W., A. & Co., who took the same in good faith and without notice of the
plaintiffs' claim and advanced $10,000 to W. upon it. W. having failed, be-
fore the turpentine had been paid for, the plaintiffs applied to C. the master
of the vessel, for a bill of lading, which was refused; C. stating that he had
already given a bill to W. A demand of the goods was then made by the
plaintiffs, and refused. *Held* that the actual delivery of the goods on board
ship, by the plaintiffs, under the contract of sale, without notice of owner-
ship, or that the price had not been paid, and without taking receipts or a
bill of lading, and the subsequent execution of the bill of lading to W.
and his indorsement thereof to W., A. & Co., freed the goods from the
plaintiffs' right to resume the possession of the same for the non-payment
of the price.

*Held, also,* that as between the plaintiffs and the bona fide indorsees of the
bill of lading, the plaintiffs' delivery under the contract of sale must be
deemed to have been absolute and unconditional.

*Held, further,* that the plaintiffs had not a right to resume the possession of
the goods without paying, or offering to pay, the moneys in good faith ad-
vanced by W., A. & Co., to W. on the bill of lading.

And that, as against C., the master of the ship, they were not entitled to a
delivery of the goods without indemnifying him against his liability under
the bill of lading.

MOTION for a new trial, upon a bill of exceptions. The
action was replevin, for 844 barrels of spirits of turpen-
tine, and was tried by a jury; who found a verdict for the
plaintiffs, and assessed the value of the property at $14,476.81.

*G. Dean,* for the plaintiffs.

*Daniel Lord,* for the defendant Champion.

*By the Court*, SUTHERLAND, J.   This was an action to recover the possession of 844 barrels of spirits of turpentine, on board the ship Victoria, in the port of New York, of which ship the defendant Champion was master.

At the time of the commencement of the action, the plaintiffs claimed the immediate delivery of the property, and the same was unladen from the ship and delivered to the plaintiffs. · Five hundred and twenty-nine barrels of the turpentine were delivered on board the ship on the 12th and 13th, and the remaining 315 barrels on the 15th or 16th of January, 1855. On the 13th of January, when 529 barrels were on board, the defendant Woodhull went to the office of the agent of the ship and requested bills of lading for the turpentine, stating that the greater part was on board, and the rest alongside ; and upon his delivering the written guaranty of one A. C. Woodhull, that it should be put on board without delay, a bill of lading for 800 barrels in the usual form, to be delivered at the port of London, "unto order or assigns," was made out, signed by Champion as master, and delivered to him, (the defendant Woodhull,) as owner and shipper.   On receiving the bill of lading, Woodhull indorsed it to Warburgh, Azemar & Co., who advanced him $10,000 on it.   When the bill of lading was given, the lighterman's receipts were not surrendered ; nor does it appear that any thing was said about them.   Woodhull, in December, 1854, made a contract with the agent of the ship to take in her, on freight, to London, a quantity of spirits of turpentine.   On the 9th of January, 1855, Woodhull made a contract with Blossom & Alburtus, (Blossom being a son of one of the plaintiffs and brother of the other,) for the purchase of this parcel of spirits of turpentine, to be delivered on board the Victoria, informing them of his agreement for the freight; to be paid for, Woodhull says, in ten days ; but Blossom (of Blossom & Alburtus) says the sale was for cash on delivery.   Blossom & Alburtus not having the spirits of turpentine, bought the parcel of the plaintiffs for cash on delivery aboard the Victoria.   When

sold by the plaintiffs, the spirits of turpentine was on storage, in the storage yard of a Mr. Robbins in Brooklyn, and from his yard was by him delivered on board the Victoria, in lighters, by order of the plaintiffs. Printed blank receipts were sent with the lighters, and after being filled up and signed by the mate of the Victoria, were returned with the lighters to Robbins. These receipts did not contain the name of any person as freighter or shipper. In this respect they were all alike. The following is a copy of one of them :

*"New York, January 12th,* 1855.

Received from lighter Wave, on board ship Victoria, two hundred and ninety-four barrels spirits turpentine, in good order. A. E. ANDERSON.

294 bbls."

Robbins says the receipts sent by lighters were printed blanks, made for the convenience of the storage yard, which he kept bound up in a book and were cut off as used, and sent with lighters. The lighterman's receipts were delivered up by Robbins to the plaintiffs. On the 17th of January the plaintiffs called on F. A. Blossom (of Blossom & Alburtus) with these receipts for payment. F. A. Blossom told one of the plaintiffs (his brother,) that *he* had not been paid, and could not pay. The plaintiffs, with F. A. Blossom, then (the same day,) called upon the defendant Champion and requested bills of lading in the plaintiffs' name. Champion refused, stating that he had already given bills of lading to Woodhull. On the same day the plaintiffs demanded the delivery to them of the 844 barrels of spirits of turpentine from the defendant Champion, and it was refused. On the following day the goods were taken from the ship by the proceedings in this action, and delivered to the plaintiffs.

These are the principal facts which appeared on the trial of this action at the circuit. There was no evidence that the master, owners or agents of the ship had any notice that the plaintiffs were the owners, or that Woodhull was not the owner of the goods, before the bill of lading was delivered to

Woodhull, or until the plaintiffs requested bills of lading in their name. There is nothing in the case to show that the master did not act in good faith in giving the bills of lading to Woodhull.

The foreman in charge of the lighters, in delivering the spirits of turpentine, spoke of it to the mate as Woodhull's turpentine. There was no notice to the mate, when delivered, that it was not Woodhull's. Robbins, in whose storage yard the turpentine was, and who delivered it by the order of the plaintiffs, before it was delivered and before the bill of lading was given to Woodhull, called upon the agent of the ship and complaining of the delay in receiving it on board, asked "why the ship did not take in Woodhull's turpentine."

Woodhull failed on the 17th of January, and in a few days afterwards made an assigtiment; and F. A. Blossom had been informed of his failure when he called with his father (one of the plaintiffs,) upon the master of the ship for the bills of lading; but Woodhull undertakes to explain his failure, and swears that on the 13th of January, he did not mean to stop.

It appears from the case, that in making the purchase of the plaintiffs, the name of F. A. Blossom only was used, and Woodhull's not mentioned; that F. A. Blossom was in good credit not only with the plaintiffs but with others; that Woodhull was in good credit with F. A. Blossom, but not in as good credit as F. A. Blossom, with the plaintiffs or with others. It also appears, that F. A. Blossom and Woodhull had various transactions together of like character, before, on account of which Woodhull was indebted to F. A. Blossom, or to Blossom & Alburttis, about $10,000 when this transaction took place; that on the 13th of January, before the bill of lading was given to Woodhull, F. A. Blossom called upon Woodhull and asked him if he was not going to send his bills of lading by the steamer that day; told him that he might as well do it, as the spirits of turpentine would be all on board by 12 o'clock, and that he was short and wanted

some money. It also appears that on the 13th of January, Woodhull paid to F. A. Blossom $2000 of the money received of Warburgh, Azemar & Co. The evidence does not show that Woodhull procured the delivery on board the ship, or the bill of lading, fraudulently. It was conceded on the argument, that Warburgh, Azemar & Co. were bona fide indorsees of Woodhull's bill of lading, for value, without notice of the plaintiffs' claim.

The most favorable view of the plaintiffs' case, which the evidence will warrant, is, that as between them and Blossom & Alburtus, and as between Blossom & Alburtus and Woodhull, the sale and delivery was conditional, and that on the non-payment of the price, they had a right to reclaim the goods. This was the ground upon which, at the circuit, they put their right to retake the possession of the goods, and upon which, on the argument of this case, they resisted the defendant Champion's motion for a new trial. The judge at the circuit viewed it as a question of title, and charged the jury in substance that as the plaintiffs' held the ship's receipts, they were entitled to the bill of lading; that they had not actually delivered the goods; and if the sale was for cash on delivery, the price not having been paid, the plaintiffs were entitled to the re-delivery thereof, and to recover.

The case is certainly not free from difficulties; but upon the whole, I think the judge at the circuit erred in his view of the question.

I am inclined to think the question is not one of title; but rather, *conceding* the sale to have been conditional as between the plaintiffs and Blossom & Alburtus, and as between Blossom & Alburtus and Woodhull, and that as between them the title did not pass, and the plaintiffs had a right to resume possession on the non-payment of the price, whether the plaintiffs could assert their title and resume the possession of the goods thus given by them to the ship, *as against Warburgh, Azemar & Co., the bona fide indorsees of the bill of lading, without paying or offering to pay their*

*advance on it;* or as against the master of the ship, without indemnity; for any responsibility which he had thus been led by the plaintiffs to assume, by issuing the bill of lading to Woodhull.

Could the plaintiffs resume the possession of these goods as against the indorsees of the bill of lading without paying their advance on it?

As between the plaintiffs and Blossom & Alburtus, and as between the latter and Woodhull, the delivery on board the ship was a delivery to the vendees. The goods were to be delivered on board the Victoria, and if the plaintiffs had got their money, they never would have asked for a bill of lading. On receiving their pay the plaintiffs expected to deliver up the receipts to the vendees, and let them get the bill of lading. The plaintiffs did actually deliver the goods on board the ship, without any notice to the master, or agent, or owners, or any one on board, that they had not received their pay for the goods; without notice that the delivery was conditional; without notice even that they were the owners and shippers.

The lighterman's receipts appear to have been mere vouchers as between the men in charge of the lighters and Mr. Robbins, to show the delivery of the goods on board. Not containing the names of the plaintiffs as shippers and owners, as the shipper's receipts did in *Jones* v. *Bradner*, (10 *Barb.* 200;) *Craven* v. *Ryder*, (6 *Taunt.* 433;) *Brower* v. *Peabody*, (3 *Kern.* 121;) they did not imply notice of who the shippers or owners were, and did not on their face give the plaintiffs a right to a bill of lading or to control the disposition and further delivery of the goods.

These lighterman's receipts did not show *that the plaintiffs' delivery on board the ship was not an absolute, unconditional delivery to their vendee.* Had the goods been delivered by the plaintiffs to Blossom & Alburtus, not on board the ship but at their warehouse, without payment, and Blossom & Alburtus had sold and delivered the goods to a bona fide pur-

Blossom *v.* Champion.

chaser without notice, the plaintiffs' lien for the price of the goods would have been gone, and they could not have reclaimed them, as against such bona fide purchaser. (*Smith* v. *Lynes*, 1 *Selden*, 41–48. *Palmer* v. *Hand*, 13 *John.* 434. *Caldwell* v. *Bartlett*, 3 *Duer*, 352.)

The delivery of the goods in this case on board the Victoria was an actual delivery, though conditional. The possession of the ship was the possession of Woodhull, as between him and Blossom & Alburtus, and the possession of the latter as between them and the plaintiffs. The bill of lading on its execution represented the goods; and was so far negotiable, at least, that the indorsement of it to Warburgh, Azemar & Co. without notice, for value, gave them all the rights and protection of bona fide purchasers. (*Lickbarrow* v. *Mason*, 2 *T. R.* 70. 1 *H. Bl.* 357. *Parker* v. *Patrick*, 5 *T. R.* 175. *Conrad* v. *Atlantic Ins. Co.*, 1 *Peters*, 386, 444, 5. *Gibson* v. *Stevens*, 8 *Howard*, 384, 400. *Bank of Rochester* v. *Jones*, 4 *Comst.* 497. *Keyser* v. *Harbeck*, 3 *Duer*, 373. *Walter* v. *Ross*, 2 *Wash. C. C. R.* 283. *Nathan* v. *Giles*, 5 *Taunt.* 558, 573. *Morrison* v. *Gray*, 9 *Moore's C. B. R.* 484. *The Mary Ann Guest*, 1 *Blatchf. C. C. R.* 358.)

If, as was said by the court in *Dows* v. *Perrin*, (16 *N. Y. R.* 325,) outside of the case actually before the court, a party who obtains a bill of lading from the owner of the goods by fraud, by indorsing it over, puts his bona fide indorsee in no better position than he is, it does not appear, nor is it claimed in this case, that Woodhull procured the delivery of the goods on board the vessel by fraud; or that he obtained the bill of lading from the plaintiffs by fraud.

The right of stoppage *in transitu*, when goods are sold on credit, and the right of resuming possession when sold for cash and actually delivered, are practically the same. In either case the exercise of the right is the enforcement of the vendor's lien on the goods for the price, by reinvesting himself with the possession. (*Hodgson* v. *Loy*, 7 *T. R.* 445. *Gorden* v.

*Harper, Id.* 9.    *Wentworth* v. *Outhwait,* 10 *Mees. & W.* 375.
*Palmer* v. *Hand,* 13 *John.* 434.    2 *Kent's Com.* 541.)

Although originally the right of stoppage *in transitu* came
from a court of equity, on the theory that the title had passed
by the sale and delivery to the carrier, and the right of resum-
ing possession in cases of conditional sales for cash may be
upon the theory that the title has not passed, yet the prac-
tical right of retaking the goods, is the valuable right in both
cases, and is exercised by the vendor in both cases for the pur-
pose of obtaining his pay for the goods.    The equities of the
bona fide purchaser without notice from a vendee in the actual
possession of the goods who was to pay cash, are at least as
great as the equities of a bona fide purchaser from a vendee
not in the actual possession who has bought on credit.    As
the right of the unpaid vendor to stop the goods in transitu
on discovering the vendee's insolvency, is defeated by the ven-
dee's negotiation of the bill of lading to a bona fide indorsee,
so I think that in this case, the actual delivery of the goods
on board ship by the plaintiffs *under the contract of sale,* with-
out notice of ownership, or that they had not been paid, and
without taking receipts or a bill of lading which would have
enabled them to control the possession and disposition of the
goods, and the subsequent execution of the bill of lading to
Woodhull and his indorsement of it, *as to his bona fide indor-
sees of the bill of lading,* freed the goods from the plaintiffs'
right to resume the possession of the goods for the non-pay-
ment of their price.    As between the plaintiffs and the bona
fide indorsees of the bill of lading, the plaintiffs' delivery
under the contract of sale, must be deemed to have been *abso-
lute and unconditional.*

Had the case shown that Woodhull had fraudulently
procured the delivery of the goods on board the ship by the
plaintiffs, under a contract of sale, and had fraudulently pro-
cured the bill of lading on their delivery ; *yet as the possession
of the ship would not even in that case have been tortious,* and
as the greater part of the goods were actually on board when

the bill of lading was executed; and the remainder were put on board before the plaintiffs gave any notice of their ownership or claim; I have found no case or authority except that of *Dows* v. *Perrin*, (16 *N. Y. Rep.* 325,) tending to show that Warburgh, Azemar & Co., as bona fide indorsees of the bill of lading, would not have been protected as bona fide purchasers. (*See cases before cited, and Mowrey* v. *Walsh*, 8 *Cowen*, 238.)

In *Saltus* v. *Everett*, (20 *Wend.* 269,) the bill of lading through which the Messrs. Saltus claimed, was not executed by Collins, the master of the vessel by which the shippers at New Orleans shipped the lead, but by the master of another vessel to which *Collins, without the authority of the shippers*, had fraudulently or wrongfully transferred it. The complaint in this case admits the possession of the ship to have been lawful. The plaintiffs complain of an unlawful detention, not of an unlawful taking of the property. The case of *Dows* v. *Perrin*, (16 *N. Y. R.* 325,) was peculiar, inasmuch as Niles & Wheeler, by whose clerk the bill of lading was made out and delivered, were not only the carriers but the owners of the goods. The real question in the case was whether they had authorized the execution or *delivery of the bill of lading* to Bloss. In *Brower* v. *Peabody*, (3 *Kernan*, 121,) the ship's receipts containing the names of the owners and shippers were *stolen* by Lovett, one of the vendees, *not delivered to him by the owners.*

Admitting that according to the usage of trade, in this case, the master of the vessel ought not to have given the bill of lading to Woodhull without the surrender of the lighterman's receipts; yet the right and title of Warburgh, Azemar & Co., as bona fide indorsers of the bill of lading, ought not to be affected by such irregular or wrongful act of the master. The convenience—I might almost say the necessity—of commerce, requires bills of lading to be so far negotiable as to protect the title of the bona fide indorsees of the bill of lading in this case.

If the delivery of the bill of lading to Woodhull was not

·the plaintiffs' fault, in delivering the goods on board without receiving the price, or giving notice that they had not been paid and without requiring receipts therefor in their own names, which would show that they meant to retain the possession and control of the goods, but was the master's fault in neglecting to require the surrender of the lighterman's receipts, then the plaintiffs should have brought trover against the master for the wrongful conversion of their goods by the delivery of the bill of lading to Woodhull; and in such action they might have recovered the value of the goods &c. as damages. Such an action would not have repudiated the rights and title or constructive possession of the bona fide indorsees of the bill of lading, but would have affirmed them; because it would have been instituted and would have proceeded, on the ground that as between the plaintiffs and the master of the ship, the plaintiffs were entitled to claim a delivery of the goods, but that as between the plaintiffs and the bona fide indorsees of the bill of lading they were not.

I believe all the cases cited by the counsel for the plaintiffs on the argument, to show his right to maintain this action of replevin, were cases of trover against the master, except that of *Brower* v. *Peabody*, (3 *Kern.* 121.)

There is great conservatism in long settled forms, and I am not sure that the abolition of all forms of actions and of pleadings has not led, and may not lead occasionally, inadvertently, to the confusion, if not abolition of principles. But again, if bills of lading are not negotiable and do not represent the goods, so that the bona fide indorsees of the bill of lading in this case were not in the possession of the goods as bona fide purchasers, and are not entitled to protection as such, then, as the master of the ship delivered the bill of lading to Woodhull in good faith, and without notice, and under the freight contract with Woodhull, under which he had a right to presume the goods were sent on board, I think as against the master the plaintiffs had no right to complain of the results

of a possession thus given by them to the ship; and that they were not entitled to a delivery of the goods from the ship, without indemnifying the master against his liability under the bill of lading. The issuing of the bill of lading under the circumstances, as to the plaintiffs, put the master in the position of a bona fide purchaser without notice. (*Keyser* v. *Harbeck*, 3 *Duer*, 373. *Caldwell* v. *Bartlett, Id.* 352. *Tindall* v. *Taylor*, 28 *Law and Eq. R.* 215.) If Warburgh, Azemar & Co. as the bona fide indorsees of the bill of lading, had not a right to hold the goods until paid the amount advanced by them on it, then the master was absolutely liable to them, under the bill of lading, for such advances. (*The Mary Ann Guest, supra.*)

In either view of the case, the plaintiffs had not a right to resume the possession of the goods, without paying or offering to pay, the moneys in good faith advanced by Warburgh, Azemar & Co. on the bill of lading. I come to this conclusion with the less regret, because it would appear from the case, that this action was in fact brought for the benefit of F. A. Blossom, or of Blossom & Alburtus, to whom the plaintiffs sold the goods; and F. A. Blossom certainly does not appear in the transaction in as favorable a light as either the indorsees of the bill of lading or the master of the ship. F. A. Blossom was a man of responsibility. The plaintiffs might have waived the condition of the sale; treated it as an absolute sale; and recovered the price of the goods of him, or of him and Alburtus. Instead of doing this, after being informed that the bill of lading had been delivered to Woodhull, and probably, of the circumstances under which it had been so delivered, and Woodhull had obtained the advance on it, the plaintiffs chose to rescind the contract, and release F. A. Blossom by claiming and actually by legal proceedings obtaining a delivery of the goods to them; and F. A. Blossom, on the trial, aids them with his testimony, although it would appear that before all the goods were on board the ship, he made the sug-

gestion to Woodhull to get the bill of lading, and received $2000 of the money which Woodhull procured on it.

The motion for a new trial must be granted, with costs to abide the event.

[NEW YORK GENERAL TERM, October 4, 1858. *Davies, Clerke* and *Sutherland,* Justices.]