## BLOSSOM and another *vs.* CHAMPION and WOODHULL.

A bill of lading does not represent goods or merchandise, when shipped on board a vessel, unless the bill has been delivered to the true owner of the merchandise.

It is not in the power of a common carrier or bailee to change the title to merchandise shipped on board of a vessel, or intrusted for storage, by the delivery of a bill of lading or storage receipt for such merchandise, to some person not the bona fide owner thereof, or possessed of the apparent right of ownership, or of disposal as agent.

Even the subsequent purchase of such a bill of lading or storage receipt, transferred in good faith for a valuable consideration, will confer upon the purchaser no title to the merchandise therein mentioned.

It may create a liability against the vessel and owners, or in the case of a storage receipt, against the bailee, to the extent of the damage sustained by the purchaser; but the title to the merchandise is not affected.

The plaintiffs sold to B. a quantity of spirits of turpentine, to be paid for in cash on delivery, and B. sold the same to W. The plaintiffs, by order of B., caused the property to be shipped on board a vessel of which the defendant C. was master, taking receipts therefor, which they continued to hold. W., without having paid for the property, and without any actual possession or indicia of ownership, procured from the agent of the vessel a bill of lading as owner and shipper of the goods, and indorsed the same to parties advancing money upon it. It being proved that a custom had long prevailed at the port of shipment to deliver bills of lading for merchandise shipped for transportation only to the party holding the receipt of the master or agent of the vessel; it was *held* that the title and right to the possession of the property was in the plaintiffs, and the owners of the vessel having no authority to deliver a bill of lading to a party not having the usual evidence upon which bills of lading are customarily delivered, the plaintiffs were entitled to recover the possession of the property, in an action against C. and W.

*Held, also,* that the vendors had not lost their title by omitting to notify the master or owners of the vessel of the terms upon which the property was agreed to be sold, and that the price had not been paid.

*Held, further,* that the custom was not unreasonable, but tended to the protection of the shipper as well as the ship owner; and that there was no error in admitting evidence of it.

*Also held* that the defendants having denied the plaintiffs' title to the goods, they had no legal right to demand, by way of counter-claim, freight, damages for breach of any freight contract, or for the delaying of the vessel, or for the reasonable expenses to which the vessel or her owners were subjected by the plaintiffs in recovering the possession of their merchandise unjustly withheld.

And the sum of $2000, part of the advance obtained by W. on the bills of lad-

Blossom v. Champion.

ing having been afterwards paid to other parties on general account, and by them paid to the plaintiffs without knowledge of the source from whence it was obtained, and the same having been by the plaintiffs applied on account of other indebtedness; it was *held* that C. was not entitled to the benefit of that payment.

THIS action was brought for the claim and delivery of 846 barrels spirits turpentine as detained by the defendants, being the property of the plaintiffs. The defendant Champion answered, 1. Denying the wrongful detaining, and that the goods belonged to the plaintiffs. 2. Alleging that at the time he was master of the ship Victoria, in the port of New York, bound to London; that the defendant Woodhull had engaged freight in the said ship for 800 barrels spirits turpentine and other property, with the exclusion of any other spirits turpentine than that of Woodhull; that the plaintiffs shipped the turpentine under this agreement; that the defendant gave a bill of lading to Woodhull or order, on which Warburg, Azemar & Co. advanced to Woodhull in good faith $11,000 on a transfer of the bill of lading, which has never been surrendered. 3. By way of answer and *counter-claim*, that Woodhull agreed to pay freight at a certain rate; that the goods had been stowed in the ship with other goods before notice of any claim by the plaintiffs, and the ship was ready for sea, and the goods claimed could not be removed without unlading other goods; that by the plaintiffs taking the goods the ship owners are entitled to the freight agreed, to the expenses of unlading, &c., and to demurrage for detention of the ship. And that the plaintiffs are not entitled to take the goods without tendering the freight and indemnifying the owners, which they have not done. And the defendant claimed to recover the freight and damages from the plaintiffs; and he claimed a return of the goods. The plaintiffs replied, denying the allegations of the counter-claim, and alleging that the plaintiffs demanded bills of lading as evidence of their property, which the defendant would not sign; that he denied the plaintiffs' title and did not set up any lien. The

cause was tried at the New York circuit, January 25, 1860, and a verdict rendered for the plaintiffs. The jury found the value of the property to be $14,591. A motion was made for a new trial on a case with exceptions at special term, on 3d of February, 1860, and denied, pro forma, without discussion. From this the defendant appealed to the general term. The facts appearing on the trial were as follows : In November, 1854, Albert Woodhull made an agreement for freight in the ship Victoria, then on her voyage homeward, by which he was to ship 1000 barrels spirits turpentine and 3000 barrels crude turpentine ; and no other of such goods were to be taken in the ship on the voyage. The ship arrived in December, and the crude turpentine was taken on board between January 3 and 9, 1855. On the 9th of January Woodhull agreed with Blossom & Alburtis that they would furnish the spirits turpentine, they knowing of his freight engagement in the ship. Blossom & Alburtis (consisting of Frederick A. Blossom, a son of the plaintiff Benjamin Blossom, and Clement W. Alburtis) purchased from the plaintiffs, in F. A. Blossom's name, 800 barrels spirits turpentine, for cash on delivery, to be shipped in the Victoria ; the sellers to keep the ship's receipts until the cash was paid. January 11 (Thursday) the agent of the ship gave notice to Woodhull that the ship was ready to receive his shipment. The spirits turpentine was sent to the ship in three lighter loads, two of which were along side of the ship on Saturday, January 13, and as some of the witnesses say, the three loads, and was all immediately shipped, finishing the loading by Monday, January 15. On the deliveries receipts were signed by Anderson, mate of the ship, expressing by what lighter and what quantity, but not from what person. The shipment was sent by the plaintiffs to the Victoria, by order of F. A. Blossom. The plaintiffs had made no freight engagement in the Victoria ; they knew the spirits turpentine was for shipment in the Victoria. On Saturday, January 13, a steamer being about to sail, Woodhull wished to draw against this

shipment, and applied to the agents of the ship for a bill of lading. They took a guaranty that all the quantity should be shipped, and thereupon signed a bill of lading to Woodhull for 800 barrels spirits turpentine. This bill of lading Woodhull took on the same day to the agents of Warburg, Azemar & Co., and on it received an advance of $10,000, and on the following Monday the balance of the amount which had been agreed on. Woodhull, out of this, paid on the same day $2000 to F. A. Blossom. And by F. A. Blossom's check book it appeared that this $2000 was deposited on that day, (Jan. 13,) and that it was part of an amount in bank from which he paid the plaintiffs $2000. On the 17th of January, A. Woodhull failed. On the same day, the plaintiff, C. W. Blossom, went to the office of F. A. Blossom, stating that the shipment in the Victoria was completed as agreed, presented the mate's receipts and demanded payment ; he replied, he could not pay it. Early in the morning of that day the plaintiffs knew that other bills of lading had been given for the spirits turpentine. He, however, had a bill of lading made out, dated 12th January, (Friday,) for the quantity mentioned in the receipts, and the agents of the ship forbade the captain's signing them. He then demanded the goods to be put on the wharf. This being refused, he took out the process in this action. On the 9th May, 1855, after the ship returned from London, proceedings were had against her on the bill of lading given to Woodhull in the name of the parties making the advance to him ; the owners of the ship pleaded the taking of the goods under the process in this action ; but the ship was made liable for the value of the goods on that bill of lading, which was paid. The master and owners of the ship knew of no interest in the goods, other than that of Woodhull. The plaintiffs' office was in New York within a short distance of that of the agents of the ship. The plaintiffs had no contract with the ship for taking these goods. The indorsees of Woodhull's bill of lading took it without notice of any title but his. The plaintiffs proved the

existence at the port of New York of a uniform and well known usage, to deliver bills of lading only to the person holding the ship's receipts. This usage was not disputed by the defendants.

*Daniel Lord,* for the appellant. I. The delivery of the goods in question to the ship, under a contract with Woodhull alone and for the receiving of goods from him exclusively, entitled the ship to protection against any private conditions between the plaintiffs and Blossom, the purchaser. (1.) The plaintiffs knew that they had no right to ship the goods on their own account; and they did not ship them on their own account. (2.) They did voluntarily and intentionally ship them, for carriage in the defendants' ship, on some agreement not made by them, and for some account other than their own. (3.) As to all persons dealing in good faith on the plaintiffs' delivery of the goods to the ship, without knowledge of the condition between them and F. A. Blossom, the plaintiffs have waived that condition. (*Smith* v. *Lynes,* 1 *Seld.* 46.) (4.) By their voluntary act they have allowed this shipment to be made in fulfillment of a freight contract, to which they were not parties, and as to which they were bound to make inquiry. (5.) And the ship having received the goods under the contract, without any notice of a secret condition, is in the relation of a bona fide purchaser, without notice, as to any obligations assumed in good faith in reliance on such receipt of the goods. This is the doctrine charged by the judge on the trial, and which must now be taken as correct; or the defendants must be allowed a new trial, in order to except to any decision to the contrary.

II. The ship owners were in no fault in signing the bill of lading, under which they have been made to pay the value of the goods to the indorsees thereof. (1.) The rule to be applied to the defendants in giving that bill of lading is not that of implied notice or suspicious inquiry, but of ordinary care, showing the absence of bad faith and gross negligence.

(*See Goodman* v. *Simonds*, 20 *How. S. C. R.* 363, *and the principles there stated; also Jones* v. *Smith*, 1 *Hare's R.* 43, and 1 *Phil. Rep.* 244, *S. C.*)    (2.) The plaintiffs could have given express notice of the condition on which they were delivering property to the ship, which delivery would create great difficulty if it was to be afterwards enforced. The plaintiffs having omitted the very easy act of giving express notice to a near neighbor, are in no condition to demand from them extreme diligence.    (3.) The judge erred in charging that if there were facts which should have put the ship owners on inquiry, as men of ordinary prudence, that was enough to take away their defense.    (20 *Howard's U. S. R.* 43.)    The rule calls for actual notice, or such neglect as is proof of bad faith.

III. The admission of the evidence of usage, and the instruction of the judge to regard it as a test of diligence, were erroneous.  (1.) The usage itself was not legal nor reasonable, so as to bind every one.    No ship is obliged to give a receipt for goods taken on board.    No shipper is obliged to receive receipts, the loss or mislaying of which would be so embarrassing, if the pretended usage is upheld.    No ship can refuse a bill of lading because they are not surrendered. No ship is protected in giving a bill of lading to the possessors of ship's receipts.    (*Brower* v. *Peabody*, 3 *Kern.* 125.)    The usage, as spoken of by all the witnesses, is founded on an erroneous notion of law, that the receipts are necessary or effectual negotiable muniments of property. This is in no sense true.    It cannot be compulsory on a ship owner to submit to a usage so ill founded and resting on such errors, on pain of being charged with gross negligence. (2.) The mate's receipts are only useful to assure to the ship owners that the goods are actually laden.    They are no evidence as to the ownership or right in the goods.    The practice, which by all the witnesses is shown to be a part of the usage, to give bills of lading on a guaranty that the specified goods shall be laden, shows that the only purpose of the receipts

is to show that the goods are laden. In this case the goods were laden, undeniably, and the bills of lading fulfilled, before any notice of the plaintiffs' claim. The guaranty spoken of by the witnesses was only as to the fact of lading, and not as to the title to the property; it was not against a negotiation 'of the receipts, for they are not negotiable. (3.) The charge that taking a guaranty on signing the bills of lading could be regarded as calling for inquiry by the ship owners, was erroneous. Signing bills of lading on guaranties was part of the alleged usage. And the guaranty was actually fulfilled. (4.) The charge that the allowance of a commission to Woodhull on his own shipments could be regarded as bearing on the question of good faith or of notice, was erroneous. They were allowed on their own goods, as well as on the goods of others, a diminution of freight. This called for no inquiry as to whose any goods were, as it made no difference whose they were.

IV. The admission of evidence as to Albert Woodhull's business and insolvency was erroneous. (1.) The only fact material to the plaintiffs' title, was the condition between the plaintiffs and F. A. Blossom. If that condition was broken, the solvency or insolvency of A. Woodhull was immaterial and irrelevant. (2.) The evidence thus admitted created, of necessity, a confusion in the minds of the jury; and by its being admitted, they must have deemed it material, and been influenced in their verdict by it. (3.) As the charge was that a fraudulent intent by Woodhull to purchase without intent to pay was immaterial, it seems impossible that his solvency or insolvency could be looked into on the trial, as bearing on the verdict.

V. The ship owners were entitled to all the expenses, demurrage and freight, even if they are to be held liable for not signing bills of lading, or not delivering the property to the plaintiffs. (1.) The goods were all lawfully received under a freight contract by a purchaser deriving title from the plaintiffs, and the delivery was with their consent. They cannot

Blossom *v.* Champion.

consent to such acts without assuming the liability for them until the plaintiffs disaffirm the delivery. (2.) The ship, by the plaintiffs' own delivery, was subjected to the expenses of lading, to the loss of space of these goods so far as not supplied, to delay of the ship, and the expense of unlading. (3.) It is no answer to this claim that the ship would not carry the goods for the plaintiffs. No contract had been made with them; the right to the space was in Woodhull, by his agreement. The plaintiffs therefore had put their goods into the possession of the ship owner, to his prejudice, and then attempted to withdraw them by virtue of a secret condition. They were bound not to disturb that possession without an indemnity. (*Tindale* v. *Taylor*, 28 *L. & Eq. Rep.* 215.) (4.) The plaintiffs were bound to offer and make this indemnity, not merely on principles of lien, but of independent obligation. It should have been allowed under the counter-claim in the answer. A statement and demand of them was made at the time. (5.) The refusal to sign a bill of lading did not forfeit this right of indemnity. The ship was not bound to carry the goods for the plaintiffs.

VI. The defendants should have been allowed the $2000 derived from Woodhull's bill of lading and paid to F. A. Blossom, and by him to the plaintiffs, on the 13th of January. There was evidence that the money thus derived was thus paid by Woodhull. (1.) This payment is attempted to be applied by both Fred. A. Blossom and his father's firm, to old debts. They did not alter their condition by receiving this money, and must stand, in their claim to it, on absolute right. But they cannot disaffirm the bill of lading under which it was obtained, and yet take the fruits of it. (2.) Had the check or acceptance of Warburgh, Azemar & Co. for $2000 been specifically passed by Woodhull to F. A. Blossom, and by him to his father's firm, the latter could not have denied this application of the sum. But they are in no better condition.

VII. The delivery of the goods to the ship on the sale to F. A. Blossom, without notice of the condition to the agent of the ship, was a waiver of the condition. (*Smith* v. *Lynes*, 1 *Seld.* 46. *Furniss* v. *Hone*, 8 *Wend.* 256. *Lupin* v. *Marie*, 6 *id.* 80. *Chapman* v. *Lathrop*, 6 *Cowen*, 110.)

*Gilbert Dean*, for the plaintiffs. I. The plaintiffs ·were, prior to the delivery of this property on board the *Victoria*, the undisputed owners and possessors of the property which forms the subject of the action, and entitled to maintain the action, unless the defendants have proved that the plaintiffs have forfeited the title, or the right to possession. In other words, the admitted facts throw the *onus* on the defendants. (1.) Champion claims title through Woodhull. If Woodhull had no title or right to possession, the defense fails, because it is a fundamental principle that a person can convey or delegate only what he himself has. (*Mowrey* v. *Walsh*, 8 *Cowen*, 243. *Dows* v. *Perrin*, 16 *N. Y. Rep.* 325.) (2.) Woodhull claims no title by virtue of any dealings between himself and the plaintiffs. (3.) F. A. Blossom could convey only what he had. He and Alburtis both say that there was to be no delivery until payment. (4.) It follows that both the title and right to possession was in the plaintiffs.

II. The plaintiffs had not, by any thing they had done, authorized the defendant Champion to give bills of lading to the defendant Woodhull, without the production of the shipping receipts. (1.) These receipts are *prima facie* evidence of property in the person holding them. (*Jones* v. *Bradner*, 10 *Barb.* 200. *Craven* v. *Ryder*, 6 *Taunt.* 433. *Rush* v. *Hatfield*, 5 *Barn. & Ald.* 632. *Brower* v. *Peabody*, 3 *Kern.* 121.) (2.) No reliance is placed, in these cases, on the particular form of the receipt. (3.) These cases establish the principle that no person except the holder of the receipts is entitled to a bill of lading. (4.) It is essential to the security of commercial transactions, where so much must be done through the agency of brokers, to hold that the shipper who

permits another to take the receipts, shall be estopped from denying that he authorized him to receive the bill of lading, and that the carrier who has given receipts shall be estopped from denying the right of the *bona fide* holder of the receipts to direct them to whom the bill of lading shall be made out. (5.) The plaintiffs did all that they were required to do to place the defendant Champion in the wrong before bringing replevin. (6.) The defendant Champion did not give the bill of lading on account of any delivery of the goods of Woodhull on board the vessel, but on the credit of Woodhull and the guarantee of his son.

III. The evidence of the existence of a uniform and well known custom in New York, among persons engaged in the shipping business, to give the bills of lading to the person holding the ship's receipts, was notice to the defendant of an outstanding title sufficient to put them on inquiry. (1.) This evidence was admissible. (2 *Greenl. Ev.* § 248.) (2.) It was notice of all the facts which an inquiry would have elicited. (3.) The charge of the judge was correct, and the judgment should be affirmed.

*By the Court,* LEONARD, J. Property in things movable can only pass from the owner by his own act and consent, except in those cases only where such owner has, by his own direct voluntary consent or act, conferred upon the person from whom the bona fide vendee derives title, the apparent right of property as owner, or of disposal as agent. (*Saltus* v. *Everett,* 20 *Wend.* 267. *Brower* v. *Peabody,* 3 *Kern.* 122.) A bill of lading does not represent goods or merchandise, when shipped on board a vessel, unless it has been delivered to the true owner of the merchandise. It is not in the power of a common carrier or bailee to change the title to merchandise shipped on board of a vessel, or intrusted for storage, by the delivery of a bill of lading or storage receipt for such merchandise, to some person not the bona fide owner thereof, or possessed of the apparent right of ownership, or

of disposal as agent. Even the subsequent purchase of such a bill of lading or storage receipt, transferred in good faith for a valuable consideration, will confer no title to the merchandise therein mentioned upon the purchaser. It may create a liability against the vessel and owners, or in the case of a storage receipt, against the bailee, to the extent of the damage sustained by the purchaser, but the title to the merchandise is not affected. There may be cases, also, wherein the true owner would be estopped from alleging his title against the holder of a bill of lading, by reason of some act or misconduct on his own part.

In the present case the plaintiffs sold their merchandise, to be paid for in cash, on delivery. They caused it to be shipped on board the vessel of which the defendant Champion was master, and took receipts therefor, which they continued to hold at the time this action was commenced. The purchaser had no actual possession and no indicia of ownership. The lighterman who delivered the merchandise on the defendants' vessel sometimes spoke of it in the hearing of the mate who signed the receipts, as the property of the purchaser, but it was not in the presence, nor did it come to the knowledge, of the plaintiffs. The plaintiffs were not wanting in carefulness to fortify themselves with all the usual evidence taken in such cases to establish and preserve their rights as owners. The purchaser never paid for the merchandise so shipped, and had no indicia of any kind to represent possession or ownership by him. The casual remarks let fall by third parties, or by the purchaser or his agents, in the presence of the mate, or of the owners of the vessel, gave no authority to them to make delivery of the bill of lading to a party not having the usual evidence upon which bills of lading were customarily delivered.

The evidence was not disputed, although admitted under exception on the part of the defendant as to its validity, that a custom has long prevailed at the port of New York to deliver bills of lading for merchandise shipped for transporta-

tion, only to the party holding the receipt of the master or agent of the vessel, which is usually signed and handed to the lighterman or carman at the time of the shipment. There were some exceptions to this custom, not however interfering with its general uniform character; as for instance, that bills of lading were sometimes delivered without the surrender of the shipping receipt, where the shipper was considered of undoubted responsibility, and guarantied that the receipts should be produced when called for; also, that bills of lading were sometimes delivered to like persons, before the goods were in fact placed on board, upon a guaranty that they should be shipped in due season. In these cases there was a waiver of the strict rights of the vessel and her owners, and a confidence and credit was given which might involve a liability and loss. The uniform character of the custom was not interfered with, but these instances were exceptions arising from agreement and confidence.

The existence of this custom afforded a security to the plaintiffs that they would be able, by retaining possession of the shipping receipts, to continue the possession of their merchandise until the condition of the sale was complied with by the payment of the purchase price, according to the agreement of the vendee; or, to use the expressive language of one of the witnesses, to hold the receipts in one hand, and receive the check in the other. These receipts were so fully understood and relied on that it was mentioned, as the witnesses for the plaintiffs say, in the contract of sale. The vendor was to hold the shipping receipts till the money was paid; possession of these was considered sufficient.

It cannot be admitted that the vendors have lost their title because they did not, while the goods were going on board, send word to the master or owners of the vessel that the goods had been sold conditionally, upon payment of the price, and that no bill of lading must be delivered to any other party until the goods had been paid for. Such a practice is

not customary. The custom which did exist warranted the belief that no such notice was necessary.

It is entirely clear that if the vessel, or her agents, had adhered to the well known usage of delivering bills of lading only upon the production and surrender of the shipping receipts, or if they had paused to inquire who was entitled to the bills, no loss would have occurred. It is urged, however, that an agreement had been made between the agents of the vessel and the vendee (Woodhull) for the freight of such merchandise by him, and that none of the same kind should be carried for other parties on the ensuing voyage; and that the merchandise in question having been shipped with the sanction of the vendee, and apparently by his direction under such agreement, the agents of the vessel cannot be held to have made a careless or improper delivery of the bills of lading therefor to the vendee; and that the vendors are censurable for suffering the delivery of the merchandise on board in such manner as to lead to the assumption by the agents that there was no question as to the absolute ownership of the vendee.

It would be quite as reasonable for the vendors to complain that they were not notified of this agreement for freight, as for the agents of the vessel to complain that they had not been informed of the conditional nature of the sale of the merchandise. It is assumed, in the ordinary transactions of commerce, that parties are acting honestly and fairly, and it would also be impossible to inform others of agreements apparently affecting only the parties to them. Neither party had any right to expect any such information from the other. The plaintiffs had no knowledge, so far as the evidence shows, of the existence of any such agreement for freight. However the case might be considered under other circumstances, the want of this knowledge is an answer to the charge of carelessness or want of fairness on the part of the plaintiffs in respect to the omission to notify the agents of the vessel of the conditions of the sale before the delivery of the merchandise on board. Nor does it appear that they

were aware that the vendee had any thing to say to the agents of the vessel in respect to the shipment.

There is still less reason to censure the plaintiffs for an omission to notify the agents of the vessel that the sale was a conditional one, when it is observed that the defendant delivered bills of lading to the vendee before the merchandise was actually on board the vessel, and that an advance of $11,000 had been obtained thereon by the vendee from third parties on the same day that they were obtained.

It appears, also, that the vendee was in insolvent circumstances for some years, for a large sum. This was a circumstance calling for caution by all parties who were dealing with him, when he required credit.

It would seem that the agents of the vessel relied exclusively upon their knowledge of the character of the shipper (Woodhull) for integrity and fair dealing, and that they delivered the bills of lading to him in the trust and confidence which they had that he would ship the merchandise as agreed, and surrender the shipping receipts when requested. This confidence was misplaced, and they have suffered loss from that cause, and not for the reason that the plaintiffs did not inform them of the terms upon which the merchandise was agreed to be sold; a notice wholly unusual, and which the defendant could not expect.

It is urged that the custom above mentioned is invalid, among other reasons, because it tends to establish the negotiability of a new and unusual instrument in writing. Some of the witnesses state the custom to be that the bills of lading are delivered to the party who presents the shipping receipts, but the statement more accurately given, I think, by the other witnesses is, that the custom is to give the bills only to the party on the surrender of the receipts. Sometimes the surrender of the receipts is waived, where the responsibility of the parties is well known. Such instances are like the present one, where confidence or credit is given to some well know party. Some of the witnesses state that the

bills are given to the person who presents the receipts, unless suspicion is awakened.

There can be no conclusion drawn from the whole evidence that the receipts are negotiable, or that the holder of them is entitled to bills, without further question as to the right of the holder. The receipts amount to a strong presumption that the holder is entitled to bills of lading for the merchandise mentioned in the receipts, but the presentation of them does not preclude further inquiry. On the other hand, if the shipper, or any other person demanding bills, were unable to exhibit and surrender the shipping receipts, it would present a strong case for suspicion, and the owners or agents should make inquiry before delivering the bills.

The custom appears to be uniform, well known, and not unreasonable. It does not invalidate the custom because the vessel cannot be compelled to give receipts, or the shipper to take them. The shipper may still insist that he will ship only by such vessels as will give receipts, and the vessel may also refuse to receive freight unless the shipper will receive receipts, or conform to the custom. It is a custom that tends to the protection of the shipper, as well as the ship owner. The safeguard might be increased to shippers and owners, by inserting in the receipt a clause declaring that bills of lading shall be required only upon the surrender of the receipts.

There was no error in admitting evidence of the custom mentioned, or in the submission of the case to the jury, so far as the defendant is concerned.

Evidence of the insolvency of Woodhull was material to ascertain whether credit was given by the plaintiffs to him in respect to the possession of the merchandise, or by the defendant in respect to the delivery of the bills of lading. This, taken with other evidence in the case, afforded some ground to enable the jury to determine whether the one party or the other had given credit to Woodhull. In the absence of any new inducement, the plaintiffs would not probably abandon the condition for which they had stipulated in making the

sale to an insolvent purchaser. The agents of the vessel had given credit to an insolvent dealer with them, to a certain extent, in agreeing to rely upon him to deliver a large amount of merchandise covered by the bill of lading, and had bound themselves to give him the exclusive right to ship a particular kind of merchandise for the ensuing voyage. They might have had faith in his personal character for integrity, inducing them to overlook his want of pecuniary responsibility with slender additional security; but there is no reason to believe, from the evidence, that the plaintiffs had any such faith. The exception in this respect is not well taken.

The defendant gave evidence of the amount of the freight that would have been earned, had the merchandise so put on board been carried to its destination, and the loss and expense arising from the delay of the ship in taking it out, and in restoring the cargo which had been displaced in removing the plaintiffs' merchandise. The judge was requested at the trial to charge that the defendant Champion was entitled to be allowed for these items, if the jury should find for the plaintiffs upon their claim for the merchandise so shipped. The judge declined so to charge, and the defendant excepted to the ruling. The voyage had not commenced. The ship had not broken ground. The question does not appear to be free from doubt, whether a shipper who has contracted for freight, may not remove his shipment under such circumstances, without the payment of any freight, affording only a full indemnity to the vessel for the breach of his contract for freight. The vessel might fill up with cargo on the same or better terms, and sustain little or no damage. The following cases are adverse to the claim of the vessel: *Bailey* v. *Damon*, (3 *Gray*, 92;) *Clewson* v. *Davidson*, (5 *Binn*. 392, 401;) *Curling* v. *Long*, (1 *Bos. & P.* 634.)

In the present case there was no contract between the plaintiffs and the vessel or her owners. The plaintiffs were willing, and offered to permit the merchandise to be carried by the vessel for their account, on the same terms as it had

Blossom *v.* Champion.

been received. The defendant Champion, however, refused to recognize the title of the plaintiffs, or to deliver them bills of lading. The plaintiffs' claim of title has been sustained by the jury, under the charge of the court. The defendant was wrong in denying the plaintiffs' ownership. The plaintiffs were under no obligation to permit their merchandise to leave the port, or to remain in the vessel, while their title was denied. Under such circumstances there can be no legal foundation for demanding freight, damages for breach of any freight contract, or for the delay of the vessel, or for the reasonable expenses to which the vessel or her owners were subjected by the plaintiffs in recovering the possession of their merchandise, unjustly withheld. This exception was not well taken.

The sum of $2000, part of the advance obtained by Woodhull on the bills of lading delivered to him, was afterwards paid to other parties on general account, and by them paid to the plaintiffs, without knowledge of the source from whence it was obtained, and has been by the plaintiffs applied on account of other indebtedness. The refusal of the judge to charge so as to give the defendant Champion the benefit of this payment was correct, and the exception in that respect is not well taken.

The defendant has no ground of complaint as to the rulings at the trial, or the manner of the submission of the case to the jury. In some respects the charge was more favorable to the defense than the judge was required by law to make.

The judgment should be affirmed with costs. The result to which we have here arrived is not in harmony with the former decision of the general term in this case, (*reported* 28 *Barb.* 217,) but the evidence in respect to custom was not then before the court; and as that is a material and controlling fact in the case as now presented, we do *not* consider the former conclusion as authority controlling our present views.                    Judgment affirmed.

[NEW YORK GENERAL TERM, May 5, 1862. *Ingraham, Leonard* and *Rosekrans,* Justices.]